Filed 3/11/15  C.T. v. Super. Ct. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FOURTH APPELLATE DISTRICT

# DIVISION TWO

| | |
|---|---|
| C.T. et al., | |
| Petitioners, | E062455 |
| v. | (Super.Ct.No. SWJ010208) |
| THE SUPERIOR COURT OF RIVERSIDE COUNTY, | OPINION |
| Respondent; | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | |
| Real Party in Interest; | |
| M.W. et al., | |
| Real Parties in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Harry Staley, Judge.  Petition denied.

David A. Goldstein for Petitioner C.T. (mother).

Kim Hasler for Petitioner R.C. (father).

1

No appearance for Respondent.

No appearance for Real Party in Interest Riverside County Department of Public Social Services (DPSS).

Law office of Arthur J. LaCilento and Arthur J. LaCilento for Real Parties in Interest M.W. and S.W. (legal guardians).

Petitioners C.T. (mother) and R.C. (father)[1] are the parents of Ca.T. (child), a medically fragile child who was removed from mother's care in July 2010. The child was fifteen months old at removal and five years old at the time of the challenged orders. In this writ petition, mother challenges the juvenile court's order of November 24, 2014, granting the legal guardians' petition under Welfare and Institutions Code section 388 to set a section 366.26 hearing to consider changing the child's permanent plan from legal guardianship to adoption.[2] Specifically, mother argues the juvenile court abused its discretion in even granting a hearing on the petition because the petition did not establish a prima facie case for the requested change, in that it was supported solely by the legal guardian's self-serving declaration, with no other supporting evidence. Father, who is an alleged father, joins in mother's arguments. Because we find that the legal guardian's declaration establishes the key changed circumstance—that she and her husband now

---

[1] The alleged father never expressed any interest in supporting the child and was never raised to the status of a presumed father, and so he is mentioned here only because he filed a request for joinder to mother's writ petition.

[2] All section references are to the Welfare and Institutions Code unless otherwise indicated.

2

wished to adopt the child to provide her with permanency—and that the record as a whole shows that this would be in the child's best interest, we deny the petition.

FACTS AND PROCEDURE

*Removal and Detention—July 2010*

The child was initially removed from mother's care in July 2010 because mother was not complying with the child's medical treatment plan. The child was born with a gastrointestinal defect that required surgery to cut out a portion of the small bowel, in addition to other surgeries. The resulting "short bowel syndrome" means the child has less bowel area available to absorb nutrients and must be fed by "total parenteral nutrition" (TPN). TPN is administered through a central line catheter in the chest. This requires close monitoring to avoid infections and to make sure the child is getting enough nutrients and not losing weight. The child spent most of her first year of life at Loma Linda University Medical Center and was released on March 2, 2010.

Between Los Angeles County and Riverside County, child protective services received referrals regarding the child in March 2010 and April 2010, twice in May 2010, and again in July 2010 alleging general neglect. The following problems were reported: First, mother participated in only three days of a five-day bedside training to enable her to carry out the child's feeding regimen so that the child could be discharged from a ten-month hospital stay into mother's care. Mother stated that she suffers from untreated anxiety and depression. Second, mother takes the child out of town to her boyfriend's home where they use and sell drugs, leaving the child unattended and crying while mother uses drugs. Third, one day mother told the nurse who comes to the home each

3

day to help with feeding the child[3] that the family was leaving for the day, and promised to start the TPN—however when the nurse returned the next day the child had been fed only a small fraction of what she required. Mother reported she "forgot" to start the TPN and that the child was very hungry, so mother fed her "all kinds of food, which she can eat but in small amounts." The child became dehydrated and fevered from not receiving enough liquids, and had to be hospitalized. "The referral further stated that if the child misses regular feedings, she can become dehydrated or septic, which can be life threatening." Fourth, the child was hospitalized for 22 days in April and again in May because of multiple infections near the site of the TPN line. In addition, the line had been cut, which could result in the child starving.

Fifth, after being told by doctors at Loma Linda that the child would need surgery to treat a bowel obstruction, mother stated that she wanted to seek a second opinion. However, mother reportedly took the child to the emergency room at both Cedars Sinai Hospital and UCLA Medical Center to seek the second opinion, rather than making an appointment as Loma Linda staff had advised her to do. Medical staff at Loma Linda were concerned that the child was losing weight during this time, because the child would not be able to withstand the surgery if she lost too much weight. The TPN line began to leak, so Loma Linda medical personnel directed mother to take the child directly to the emergency room so the child could be admitted and the source of the leak found. Mother

---

[3] It appears from the record that the child received the TPN feeding each day from 4:30 pm until noon the next day, and that the child was provided with home nursing care to assist with the TPN.

4

failed to do this and both medical staff and the social worker were unable to contact mother. The social worker went to the home with a Sheriff's deputy the following evening. After consulting with a supervisor and the on-call doctor at the hospital, who reported that "this has been an on-going problem with [mother] not following through with appointments," the child was placed into protective custody and the social worker arranged for the child to be transported to the hospital by ambulance. Mother and her boyfriend initially refused to allow the paramedics into the home and resisted having the child taken to the hospital. They then insisted the child be transported to UCLA. The boyfriend became quite agitated and other people present at the property "began to make the situation more difficult and began interfering in the investigation . . . ." The deputy determined that the boyfriend had been arrested in May for a domestic violence incident with mother at the home. Mother initially denied the incident, but later stated that it was an argument that did not involve a physical altercation. It was later determined that mother and her boyfriend were arrested together in February 2010 for drug possession.[4]

At the detention hearing held on July 28, 2010, the juvenile court detained the child and set supervised visitation at a minimum of twice per week.

*Jurisdiction and Disposition—September 2010*

In the jurisdiction and disposition report filed September 17, 2010, the Department of Public Social Services (DPSS) reported that the child was doing well in her placement in the sub acute unit at San Bernardino Community Hospital, and appeared to be slightly

---

[4] Mother has an older daughter in legal guardianship with mother's grandparents. {CT 16, 916-917}

5

developmentally delayed.  Mother acted appropriately while visiting the child, who seemed to be comforted by mother's presence.  Mother appeared to have untreated mental health and dependent personality issues, and the social worker opined from speaking with family members and medical staff that mother may have suffered past traumas.  Hospital staff reported that mother's boyfriend appeared to emotionally abuse mother.  Attached to the report was a doctor's summary of the child's medical and safety issues.  The doctor concluded that the child has "multiple diagnoses which may be life-threatening when her condition isn't stable," that the child's condition had not been stable since she was initially sent home from the hospital in March, that mother did not appear to be able to stabilize the child at home despite training and in-home nursing assistance, and that the child is considered medically fragile and would require a specialized foster home.  A nurse, who was one of two primary caregivers for the child in the NICU at Loma Linda and had become a family friend, asked for her and her husband to be considered for placement.  Attached to the report is a long email from the nurse detailing the child's many surgeries, infections, diagnoses and crises while in the hospital for ten months.

At the jurisdiction and disposition hearing held on September 22 and 23, 2010, the juvenile court sustained allegations in a second amended petition under section 300.  The sustained allegations were, under subdivision (b), failure to protect, that mother:  1) fails to follow through with medical treatment for the child, who suffers from "short bowel syndrome," resulting in the child being hospitalized; 2) mother and her boyfriend engage in domestic violence in the child's presence; and 3) the child's alleged father has failed to

6

provide her with support. Under subdivision (g), no provision for support, the court found true the allegation that the alleged father's whereabouts are unknown and that he has failed to provide her with support. The court ordered reunification services for mother and denied them to father, who was only an alleged father. The court ordered mother to participate in a psychological evaluation to determine whether she could provide appropriate care for the child. The court ordered DPSS to obtain a second opinion regarding the proposed surgery and authorized mother to participate in medical decisions.

*Six-Month Review—May 2011*

In the six-month review report filed on March 8, 2011, DPSS recommended continuing reunification services to mother. Mother had obtained a restraining order against her boyfriend after he was arrested for kidnapping and assaulting her. The psychological evaluation resulted in a diagnosis of "mixed personality disorder which will impact her ability to care for a child with multiple medical needs." Mother was not taking any medication for this. Mother's arrest the previous year with her boyfriend for possessing drugs for sale resulted in felony charges that were still pending. In January, the child was placed with the nurse from Loma Linda who had requested placement.[5] Mother objected to having the child immunized, and so immunization was delayed until DPSS got a court order. The child remained medically fragile, was often sick because of infections and other complications, and was hospitalized three more times. DPSS sought

_____

[5] The foster mother quit her position at Loma Linda so she could provide 24-hour nursing care for the child at the foster home. {CT 979}

7

and obtained a court order to have the surgery to which mother had objected prior to the dependency. The child was developing normally and appeared to be happy when medically stable. Several people told the social worker that mother was still drinking heavily and doing drugs; mother denied this but did not show up for a hair follicle test. Medical staff reported that mother would bring different "weird looking" men with her when she visited the child in the sub acute unit, and that the men appeared to be on drugs. Mother was making progress in her service plan.

In the addendum report filed on May 2, 2011, the social worker reported that mother had a negative hair follicle test for drugs. For this reason, the social worker recommended six more months of services, but expressed concerns regarding "the company the mother continues to keep around her."

The six-month review hearing was eventually held on May 2, 2011. The juvenile court continued the child as a dependent of the court and continued mother's reunification services.

*Twelve-Month Review—September 2011*

In the 12-month review report filed September 8, 2011, DPSS recommended six more months of reunification services for mother. DPSS also recommended mother begin unsupervised weekend visits once mother completes one-on-one medically fragile classes with the Public Health Nurse (PHN), with the possibility of placing the child with mother on family maintenance if weekend visits and mother's case plan go well. Mother's criminal case for drug possession was still pending. Mother had two negative hair follicle tests for drugs. Mother completed her domestic violence classes, obtained

8

her own housing and stated she has had no negative contact with her former boyfriend and did not even know his whereabouts. Mother completed a parenting class and part one of the medically fragile training class, and agreed to begin one-on-one sessions with the PHN. The child was developing normally at age two and appeared happy. The child was still suffering from infections, skin breakdown, leakage in her J-tube[6] and other complications of her medical condition, but had not been hospitalized during this reporting period. The foster mother had a "good working relationship with [mother] and wants to see mother and child reunified if at all possible. One of the reasons she is working so hard to provide medical care and consistency that promotes steady progress is to insure a more successful long-term reunification with a less taxing level of medical acuity. At present, the level of care is challenging for an RN, let alone a non-medical single mother." The social worker, mother, foster mother and PHN were working closely to get mother trained so she could transition to caring for the child and her extensive medical problems. Mother visited with the child at the foster home two to four times per week and attended some doctor visits. Mother refrained from bringing her friends to the foster home. Mother was appropriate in her visits, although she was anxious to get the child to eat regular food despite the occupational therapist warnings against rushing this. Mother had completed most of her case plan and the focus was on getting her trained to care for the child medically and completing a slow transition to ensure mother was capable of caring for the child. The concurrent plan was adoption by the foster mother.

---

[6] The J-tube is used for feeding a nutrition formula and sometimes medication directly into the intestines.

9

The 12-month review hearing was held on September 21, 2011. The court continued the child as a dependent of the court and continued mother's reunification services. The court authorized mother to have unsupervised weekend and overnight visits once the mother completed her one-on-one medically fragile classes with the PHN.

*Eighteen-Month Review—September 2012*

In the status review report filed January 6, 2012, DPSS recommended returning the child to mother on family maintenance. Mother stated she was taking a weekly drug awareness class for 18 months as part of a plan to mitigate her felony charges. Mother was also working with a therapist on her mental health issues. Mother was making progress on training to care for the child's medical needs, having completed one-on-one training with both the PHN and the foster mother. The paternal great-grandmother was being trained to provide backup babysitting for the child. The child was also making strides in her overall development and all parties were working to wean her from the TPN feedings. She was down to three days per week of 14-hour TPN, rather than every day, and was making stop-and-go progress in eating food, although she was doing well at drinking water. The child was not hospitalized during this reporting period. As of the date of the report, the plan was to keep the child with the foster mother for approximately three more months to get her onto regular food and off the TPN before transitioning her to mother's care. The child had four successful, unsupervised, 12-hour visits with mother on days when she did not have TPN. The child then had two successful overnight stays at mother's home, at least one of which was during her TPN.

On January 12, 2012, the foster mother filed a request to be declared a de facto parent. The court granted that request on May 17, 2012.

DPSS filed an addendum report on March 26, 2012, in which it continued to recommend the child be returned to mother on family maintenance, but warned that mother would have to avoid domestic violence contacts with her previous boyfriend. The three-year-old child had mentioned that the boyfriend had come to see her and/or given her a Christmas present during an unsupervised visit at mother's home in December of 2011. According to police reports dated December 26 and 27, mother reported the boyfriend had contacted and threatened her on several previous occasions, although she did not report this to the police until he came to her home on December 26, and again on December 27 after he bailed himself out of jail from the December 26 incident. Upon being arrested for violating the restraining order, the boyfriend stated he was allowed to go to mother's home, and that he had spent the night there before. One of mother's neighbors stated that she had seen the boyfriend at mother's apartment several times since the end of October, and had seen him knocking on the doors and windows.

On May 2, 2012, DPSS filed an addendum report recommending mother's reunifications services be terminated and a section 366.26 hearing be set to consider a permanent plan of legal guardianship. The attempt to wean the child from the TPN was unsuccessful, and the child started to lose weight. The child had to have another surgery in March to fix the J-tube site. The TPN was resumed 14 hours per day, every day. This meant the child would continue to require intense, continuous monitoring and care. In addition, while mother was receiving extensive training in caring for the child, and

11

mother obviously loves the child, the social worker expressed concern that DPSS still had to caution mother to use judgment "when contemplating 'excursions' she wants to embark on" during unsupervised visits. The foster mother believed mother showed poor judgment while the child was recovering from surgery in March by taking the child to the playroom for excessive amounts of time rather than letting the child rest. In April, mother volunteered to mix the TPN and connect it to the central line at the end of a supervised visit at the foster parents' home. The next morning the foster mother found that mother had neglected to turn on the pump, so the child did not receive any TPN all night. After an unsupervised visit in April, mother returned the child with the central line not properly secured. This compromised the line's sterile integrity and risked infection. This also risked having the line pulled out, which "could result in a major bleed out and is to be avoided at all costs." The mother was appropriately concerned and receptive to the foster mother's later reinforcement of proper care of the central line, but this episode caused concern in light of the extensive training mother had already received.

DPSS filed a second addendum report on August 30, 2012. DPSS renewed its recommendation that reunification services to mother be terminated and a section 366.26 hearing be set to consider legal guardianship. TPN was reduced from seven days per week to five days. The foster mother and social worker continued to be concerned regarding mother's ability to care for the child and her comprehension of the serious nature of the child's condition. The child was hospitalized for four days in August when it was suspected she might have an infection in her central line. Mother complained to the social worker that the child had been hospitalized for "no apparent reason" and that it

12

had been a waste of time.  Mother continued to tell the social worker that the child was not an invalid and should spend more time going to dance classes, skating and other outdoor activities.  Mother wanted the child to have a portable TPN pump so she could go outside more.  The foster mother attempted this, but the child would not tolerate the portable pump.  The social worker was concerned that mother was placing the child's social needs ahead of her medical needs.  During unsupervised visits, mother was improperly bandaging the child's J-tube in a way that was less cumbersome and increased the child's mobility, but resulted in excessive leakage.  Previous leakage in the J-tube had necessitated the surgery the previous March.

The 18-month review hearing was eventually held on September 5, 2012.  The court terminated mother's reunification services and set a section 366.26 permanent plan selection and implementation hearing.  The court ordered that mother be informed of the child's medical appointments and that she be allowed to attend, and authorized one supervised visit per week.

*Section 366.26 Hearing—January 2013*

In a report filed October 24, 2012, DPSS recommended the dependency be terminated and the child be placed in legal guardianship.  The child had reduced TPN to three days per week, and then in October the child began a trial routine of no TPN.  The child received most of her nutrition through the J-tube and was beginning to eat some solid food three times per day.  The previous problems with J-tube leakage had become minimal once supervised visits with mother were ended at the 18-month review in September.  The social worker opined that the child's success in therapy to help her eat

normally had improved once the supervised visits were stopped, because she was in a consistent care environment where the foster mother enforced the rules. The child continued to develop normally. Mother agreed to the proposed legal guardianship.

DPSS filed an addendum report on January 16, 2013. The child had been healthy since the last court date and had increased oral intake of nutrition from 15 percent to 33 percent. The 67 percent J-tube nutrition was going well. The social worker received information from several sources, including relatives, the foster parents, and the child herself, that mother was back with her former boyfriend. Mother denied this. The foster parents stated they were willing to adopt the child if mother could not change her behavior patterns, but preferred legal guardianship at that time to give mother the opportunity to make life changes and regain custody of the child. DPSS recommended legal guardianship with the option to upgrade to adoption in the future, with one supervised visit per month.

At the section 366.26 hearing held on January 28, 2013, the court selected legal guardianship with the foster parents as the child's permanent plan and terminated the dependency. The court ordered mother to have visits as set forth in a mediation agreement, which allowed mother to have supervised visits for three hours every other Friday.

*Section 388 Petition—September through November 2014*

On September 12, 2014, legal guardians filed a section 388 petition asking the court to allow them to adopt the child. The new information cited in the petition was: (1) the child would require ongoing medical care for the rest of her life; (2) after four

14

years of dependency, mother had failed to make changes in her life that would allow her to care for the child; and (3) mother not only continues to not understand the child's medical needs, but denies that the child has medical needs. The petition stated the requested change would be in the child's best interest because: (1) the child has thrived and her medical condition has improved during the time she has been in the care of the legal guardians; and (2) the child needs long-term stability and a family that can provide for her medical needs on a permanent basis. Attached to the petition is the legal guardian's declaration describing the child's medical and personal progress in her care, mother's failure to become capable of providing for the child's complex medical needs after four years of dependency, and the legal guardians' desire to adopt the child.

At the hearing on the petition held on November 24, 2014, the juvenile court granted the petition, finding "that there is a change of circumstances, in that the legal guardians seek to adopt, and based upon the situation as described with the child and the mother and the legal guardian, those change of circumstances would make it in the best interest of the child to grant the motion to set the .26 hearing." The court reinstated the dependency and set a section 366.26 hearing for March 24, 2015.

This writ petition followed.

## DISCUSSION

Mother argues the juvenile court abused its discretion when it set a section 366.26 hearing to consider changing the permanent plan to adoption. Mother contends the legal guardian's section 388 petition asking for the section 366.26 hearing did not contain supporting evidence other than the guardian's self-serving declaration. DPSS responds

15

that the legal guardian made a prima facie showing as to the required change in circumstances and best interest of the child. The legal guardian did so, DPSS argues, when she informed the court of: (1) their new willingness to adopt the child in the face of mother's four-year failure to make progress in becoming able to care for the child's medical needs; and (2) the strengthening bond between the child and the guardians.

"A juvenile court order may be changed, modified or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist and (2) the proposed change would promote the best interests of the child. [Citation.] A parent need only make a prima facie showing of these elements to trigger the right to a hearing on a section 388 petition and the petition should be liberally construed in favor of granting a hearing to consider the parent's request. [Citation.] [¶] However, if the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition. [Citations.]" (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. [Citation.]" (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.) "[A] primary consideration in determining the child's best interest is the goal of assuring stability and continuity." (*In re Stephanie M*. (1994) 7 Cal.4th 295, 317.)

Here, the key changed circumstance, as set forth by the juvenile court at the section 388 hearing, and in the legal guardian's declaration, is that the legal guardians

16

now wished to adopt the child.  We find the declaration attached to the petition to be sufficient to establish a prima facie case of this changed circumstance.  The record indicates the concurrent plan all along had been legal guardianship or adoption, and that DPSS recommended legal guardianship instead of adoption solely because the foster parents wished to give mother as much a chance as possible to reunify with the child.  That is why the key changed circumstance is the legal guardians' decision to adopt, and the declaration more than adequately establishes this.

Regarding the child's best interest, as stated above this can be shown by the entire factual and procedural history of the case.  The record is clear that the child's very serious medical condition improved when she was in the care of the legal guardians, that it worsened when she was in mother's care to the point of being life threatening, and that unsupervised visits, and even in one instance an unsupervised visit, caused actual medical harm to the child.

For these reasons, we have no trouble whatsoever in denying this writ petition based on the overwhelming evidence in the record that the section 388 petition established a prima facie case for changed circumstances and that the proposed change to a permanent plan of adoption is in the best interest of the child.

### DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____

P. J.

17

We concur:

HOLLENHORST
                                                                          J.

McKINSTER
                                                                          J.